IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>vs.<br><br>MARCUS JEFFERSON,<br><br>        Defendant. | 8:13CR243<br><br>FINDINGS AND<br>RECOMMENDATION |

      This matter is before the court on the motion to suppress filed by defendant Marcus Jefferson (Jefferson) (Filing No. 22). Jefferson is charged in the Indictment with possession of a fully loaded .32 Smith and Wesson revolver (Count I) and nine .45 caliber cartridges (Count II) after having been convicted of a felony, in violation of 21 U.S.C. §§ 922(g)(1) and 924(a)(2). **See** Filing No. 15. Jefferson seeks to suppress evidence seized after a warrantless entry and subsequent warrant-based search of his residence in Omaha, Nebraska, on September 26, 2012, by Omaha Police Department (OPD) officers and other law enforcement.

      The court held an evidentiary hearing on Jefferson's motion on August 15, 2013. Jefferson was present for the hearing along with his counsel, W. Randall Paragas. The United States was represented by Assistant U.S. Attorney Meredith B. Tyrakoski. During the hearing, the court heard the testimony of OPD Detectives Kimberly Woolery (Detective Woolery) and James Paul (Detective Paul) and Officer Tony Friend (Officer Friend). The court received into evidence a photograph of a house (Ex. 1), an aerial map (Ex. 2), an aerial photograph (Ex. 3), an affidavit and application for a search warrant with the search warrant (Ex. 4), and an arrest warrant (Ex. 5). A transcript of the hearing (TR.) was prepared and filed on August 22, 2013. **See** Fling No. 32. With leave of court, the defendant filed a post-hearing brief on August 29, 2013. **See** Filing No. 35. When no reply was filed by the United States by September 5, 2013, the matter was deemed submitted.

**FINDINGS OF FACT**

Detective Woolery has been a police officer with OPD for over fifteen years and Detective Paul has been a police officer with OPD for twenty-one years (TR. 4, 41). Detectives Woolery and Paul have been assigned to the Safe Streets Task Force and as task force officers with the Federal Bureau of Investigation (FBI) for five years (TR. 4-5, 41-42). Generally, the task force investigates gangs involved in drugs and illegal firearm activities (TR. 5). On September 26, 2012, Detective Johnny Palermo (Detective Palermo) notified the task force there was an arrest warrant issued for Marcus Jefferson (TR. 5). Detective Palermo asked if the task force knew where Jefferson may be located (TR. 5-6). As part of the task force, Detectives Woolery and Paul had previously investigated Jefferson (TR. 6, 42).

In the late morning on September 26, 2012, Detective Woolery first went to Jefferson's father's residence near 40th and Redick streets (TR. 6-7). Detective Woolery observed a blue van registered to Jefferson in the driveway of the residence (TR. 7). Detective Woolery set up surveillance and notified the task force by use of a police radio (TR. 7). The officers were broadcasting on the fugitive task force's encrypted channel (TR. 24). Within fifteen minutes, Detective Woolery, who was by herself at that time, observed two people get into the van and drive away (TR. 7-8). Detective Woolery notified the fugitive task force so members of the task force might conduct a traffic stop of the van (TR. 8). Detective Paul was on his way to the residence when he received the notice and joined pursuit of the van (TR. 44). Detective Paul did not participate in any contact with the occupants of the van (TR. 45).

Officer Friend has been an officer with OPD for approximately sixteen years and is currently assigned to the fugitive unit where he has been assigned for nine years (TR. 72-73). Officer Friend is also deputized as a U.S. Marshal and works as a task force officer with the U.S. Marshal Service (TR. 73). Generally, he works to locate and apprehend individuals for whom the court has issued a felony arrest warrant (TR. 73). On September 26, 2012, Officer Friend was assigned to execute the arrest warrant on Jefferson (TR. 74; Ex. 5). Officer Friend had no previous experience with Jefferson (TR. 75-76). Based on information received from Detective Woolery, Officer Friend intercepted the van and conducted a traffic stop (TR. 78).

2

Officer Friend approached the right-hand side of the van on foot and made contact with the driver, Valerie Prince (Prince), and the passenger, an older female related to Prince (TR. 78-79). Officer Friend asked the two women if they knew who Jefferson was and informed them that he had a warrant for Jefferson's arrest (TR. 80). The women both stated they had "no idea" who Jefferson was and Prince said she "swears to God" she did not know him (TR. 80). The traffic stop lasted five to ten minutes and Officer Friend allowed the women to leave (TR. 80).

Detective Woolery drove up to the site of the traffic stop as the van was pulling away (TR. 9). Officer Friend informed Detective Woolery about the information he received from Prince (TR. 10). Detective Woolery told Officer Friend, Prince had lied and was probably related to Jefferson (TR. 10, 81). Detective Woolery knew Jefferson's father's last name was also Prince (TR. 10).

After the traffic stop, the officers separated to look for Jefferson at different locations. Officer Friend drove back to the 40th Street residence and made contact with an occupant who confirmed Jefferson sometimes visited but was not in the residence at that time (TR. 81). Detective Paul drove toward a residence the officers knew Jefferson frequented near 176th and Q streets (TR. 11, 46). Detective Woolery went to a residence near 54th and R streets (TR. 11-13).

At approximately 1:00 p.m., Detective Woolery set up surveillance at a residence on R Street that the officers thought was Jefferson's primary residence based on utility records (TR. 11-13, 22-23, 33, 37; Ex. 1). Jefferson's R Street residence is located between 54th and 56th streets (TR. 13). Detective Woolery set up surveillance from a vantage point one block east of the residence (TR. 17; Ex. 3). The day was clear and nice (TR. 37, 64-65). Detective Woolery could not see the front or rear of the house but she could see the front yard and driveway (TR. 18, 28). After about ten minutes, Detective Woolery saw two people walk down the street from the west into Jefferson's front yard (TR. 19). The two were in the grass to the west of the driveway facing the house and appeared to be talking (TR. 19, 29). Detective Woolery notified the other task force members of what was happening (TR. 20).

Within fifteen minutes Detective Paul arrived and parked on a road in a cemetery to the west of the residence (TR. 20, 46-49). Detective Paul observed the blue van that

3

had been involved in the earlier traffic stop parked two houses west of the R Street residence (TR. 49). Detective Paul had a clear view of the back of the van, the driveway, and a small portion of the front of the residence from where he was located (TR. 50). Detective Paul could not see the back yard of the house (TR. 61).

Detective Woolery observed the two people leave the yard, walking west on R Street (TR. 21). Within a few minutes Detective Paul observed two black females enter the van and sit in the van for two or three minutes before backing the van down R Street and turning to park on the northeast corner of 46th Street (TR. 50). The sliding door on the passenger side of the van was all the way open while the van was moving (TR. 50, 67). Detective Paul immediately thought Jefferson may run down the street from the house into the van, which would then drive away (TR. 51). Detective Paul's thought was based on his knowledge the females in the van had lied to the task force when they said they did not know Jefferson even though the van was registered to Jefferson and one of the females shared the same last name as Jefferson's father (TR. 51). Approximately ten minutes later, the van drove away to the north at two to three miles an hour toward Q Street, then turned eastbound onto Q Street and was stopped by officers, including Officer Friend (TR. 52-53, 84). Officer Friend confronted the occupants of the van about whether they knew Jefferson and why the van door was open while they were driving (TR. 85). The women maintained they did not know Jefferson, but were waiting for a friend whom they would not identify, and the door was open because they were hot (TR. 85). Officer Friend returned to the house expecting to find Jefferson in the house (TR. 86). Officer Friend thought the women were waiting for Jefferson to run out of the house into the waiting van, but the officers had arrived before Jefferson could exit the house (TR. 86, 104).

Detectives Woolery and Paul did not see Jefferson or anyone leave the residence (TR. 23, 53). The fugitive task force approached and surrounded the residence (TR. 21, 53, 86). Detective Woolery moved her vehicle to the park directly east of the residence on 45th Street and walked west into the alley stopping at the residence's back gate to monitor the perimeter with Trooper Scott (TR. 31, 37). Detective Woolery stayed by the gate for over an hour and did no further investigation about Jefferson's whereabouts during that time (TR. 32). Detective Paul moved his

vehicle into the alley behind the residence where he stayed until other officers asked him to come into the house (TR. 53-54, 63).

Officer Friend approached the front door of the residence with other officers and knocked (TR. 86-87). No one answered the door (TR. 87). Officer Friend was advised that a neighbor had seen activity at the residence earlier in the day (TR. 88). Officer Friend went to talk to the neighbor and learned the neighbor had seen the garage door close "a short amount of time" before the officers arrived, but did not see who closed the garage and did not see a vehicle or person leave the residence (TR. 89, 100). Officer Friend showed the neighbor Jefferson's mug shot photograph, which the neighbor recognized as the person who lived at the R Street residence (TR. 89). This information coupled with the other information gathered led Officer Friend to believe Jefferson was hiding in the house and would not answer the door (TR. 90). In Officer Friend's experience of executing several hundred arrest warrants, on numerous occasions individuals were found inside a house even after no one responded to a knock on the door (TR. 90-91). After speaking to the neighbor, Officer Friend made the decision to force entry into the residence (TR. 91).

Detective Paul entered the residence where he could see and smell marijuana in plain view in the basement, then he left to write the application for a search warrant (TR. 54; Ex. 4). Jefferson was not found in the residence. Detective Paul presented the application to Douglas County, Nebraska, County Court Judge Darryl Lowe, who reviewed and signed the search warrant (TR. 55-57; Ex. 4). After issuance of the search warrant the officers searched the R Street residence and found items of evidentiary significance.

## ANALYSIS

The defendant argues the officers lacked a reasonable belief he was in the R Street residence at the time officers forcibly entered to execute the arrest warrant. **See** Filing No. 35 - Brief p. 2-3. The defendant argues the faulty entry polluted the subsequent search and search warrant application. *Id.* at 2-5. For these reasons, the defendant seeks suppression of all evidence found in the R Street residence on September 26, 2012. *Id.* The defendant meets his burden of showing he had a

5

reasonable expectation of privacy in the dwelling because it was his home. **See** *United States v. Salter*, 358 F.3d 1080, 1084 (8th Cir. 2004). Since the challenged searches and seizures in this case all concern the defendant's home, his reasonable expectation of privacy gives him standing to raise the Fourth Amendment challenges asserted. **See** *Minnesota v. Olson*, 495 U.S. 91 (1990); *Minnesota v. Carter*, 525 U.S. 83 (1998).

"[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603 (1980); **see** *United States v. Collins*, 699 F.3d 1039, 1041-42 (8th Cir. 2012). "The Supreme Court has held that reasonable belief . . . is a less exacting standard than probable cause." *Burke v. Sullivan*, 677 F.3d 367, 371 (8th Cir. 2012). To show a reasonable belief exists, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the officer in objectively believing the suspect is present. *Terry v. Ohio*, 392 U.S. 1, 21 (1968); **see** *Michigan v. Long*, 463 U.S. 1032, 1049-1050 (1983).

> In evaluating this on the spot determination, as to the second *Payton* prong, courts must be sensitive to common sense factors indicating a resident's presence. For example, officers may take into consideration the possibility that the resident may be aware that police are attempting to ascertain whether or not the resident is at home. . . .

*United States v. Magluta*, 44 F.3d 1530, 1535 (11th Cir. 1995); **see** *United States v. Suitt*, 569 F.3d 867, 872 (8th Cir. 2009) (noting "the common sense nature of the reasonable-suspicion standard"). "Direct surveillance or the actual viewing of the suspect on the premises is not required." *Valdez v. McPheters*, 172 F.3d 1220, (10th Cir. 1999). An officer may have a reasonable belief the suspect is in the residence despite the failure of any person to answer a knock at the door. **See** *United States v. Lloyd*, 396 F.3d 948, 952 (8th Cir. 2005) (finding officers' belief the defendant was present in the residence was reasonable after a neighbor stated the defendant was present earlier in the day, although another neighbor said he was not home, and the officers heard noises from a fan and a dog inside the residence); *United States v. Powell*, 379 F.3d 520, 524 (8th Cir. 2004) (finding officers' observation the door was

6

ajar raised suspicions someone, the resident, was home shortly after 8:00 a.m., supporting reasonable suspicion).

"Upon legally entering a residence, officers have the authority to conduct a protective sweep of the residence if the officers reasonably believe, based on specific and articulable facts, that the residence harbors an individual who could be dangerous." *United States v. Pruneda*, 518 F.3d 597, 603 (8th Cir. 2008) (**citing *Maryland v. Buie***, 494 U.S. 325, 334 (1990)). Moreover, during a protective sweep officers may seize evidence immediately recognizable as incriminating when it is observed in plain view. *Pruneda*, 518 F.3d at 603-04.

The defendant argues the mere fact the officers verified the defendant lived at the R Street residence is insufficient to support a reasonable belief he was there at the time of the entry. **See** Filing No. 35 - Brief p. 4. Separately, the defendant argues information the officers had that the garage door had been closed at some time prior to the officers' arrival does not support a reasonable belief Jefferson was at the residence because there are several other reasonable explanations for how the garage door was closed. *Id.* The defendant also argues the circumstances surrounding the van fail to provide the officers with a reasonable belief Jefferson was in the residence because he could have easily left the residence by foot through the back alley prior to the arrival of the fugitive task force. *Id.*

The court agrees the mere confirmation the subject of an arrest warrant resides at a particular residence does not justify a forced entry into the residence. However, the totality of the circumstances and the facts available to law enforcement on September 26, 2012, supported their reasonable belief the defendant would be found within the residence on R Street. Detective Woolery observed Jefferson's van, driven by two women, leave Jefferson's father's 40th Street residence. Officer Friend heard Jefferson was not at the 40th Street residence from the resident. Jefferson was not in the van. The occupants of the van denied they knew Jefferson, then drove to Jefferson's residence, parked several houses away, walked to the residence, stood in the yard talking, then left in the van driving unusually slowly with the van door open to briefly park near the alley running behind the residence. Jefferson was not in the van. A neighbor confirmed Jefferson was the resident of the house. Shortly before officers

7

arrived, a neighbor had seen the garage door open, then closed, without anyone leaving. Although surveillance was limited, the officers did not see Jefferson leave. These specific and articulable facts taken together with rational inferences reasonably warrant Officer Friend in objectively believing Jefferson was present in the residence. Because the officers reasonably believed Jefferson was present at the time the warrant was executed, the officers lawfully entered Jefferson's R Street residence.

The defendant's reliance on *Conner* is misplaced.[1] In *United States v. Conner*, 127 F.3d 663, 665 (8th Cir. 1997), the Eighth Circuit Court of Appeals suppressed evidence obtained after an unconstitutional entry into a hotel room. Specifically, the officers demanded the suspect open the door under color of authority then observed contraband in plain view, entered the room to arrest the suspects and await a search warrant based on their observations. *Conner*, 127 F.3d at 666. The court found the suspects did not consent to the officers' entry into the hotel room, nor did exigent circumstances exist. *Id.* The *Conner* court noted, "the Supreme Court explained that no zone of privacy is more clearly defined than a person's home: '[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.'" *Id.* (noting protection extends to temporary dwellings such as hotel rooms) (**quoting** *Payton*, 445 U.S. at 590) (alteration in original). The case at bar is similar to *Conner* only to the extent no occupant of the residence consented and no exigent circumstances justified entry. The officers justify their initial entry into Jefferson's residence based on the arrest warrant and their reasonable belief the defendant lived at, and was within, the residence. The officers' lawful entrance into the residence and observations during the protective sweep supplied untainted probable cause to support the subsequent search warrant. Accordingly,

**IT IS RECOMMENDED TO SENIOR JUDGE LYLE E. STROM** that:

Jefferson's motion to suppress (Filing No. 22) be denied.

---

[1] The defendant inadvertently titled the case as *United States v. Tilton*.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) business days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 16th day of September, 2013.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge